UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

Andrew Ricard
Craig Melville

On behalf of themselves and all others similarly
situated,

Plaintiffs,

Case No. 15-cv-299

v.

KBK Services Inc.,

Defendant.

**DEFENDANT KBK SERVICES INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR DECERTIFICATION**

**INTRODUCTION**

As the party seeking to maintain certification, Plaintiffs bear the burden of demonstrating that they are "similarly situated" to the putative collective class under the FLSA. When making a determination on a motion to decertify a collective action, the Court employs a stringent inquiry into whether collective adjudication is appropriate. *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 346 (N.D. Ill. 2012). Applying this rigorous standard here, named plaintiffs and the putative class are not similarly situated, and their claims are not amenable to resolution on a class-wide basis. Consequently, the conditionally certified class—to which the parties stipulated—should be decertified.

As discussed in further detail below, the record demonstrates that this matter is not appropriate for collective resolution and that named plaintiffs are not similarly situated to the putative class members. First, at least one named plaintiff and the proposed class counsel are not

adequate to represent the putative class due to doubts about their integrity and credibility. Second, plaintiffs' claims are not based on a common policy or practice promulgated by KBK. Third, because there is no single practice at issue, individual issues on liability, damages and defenses predominate over any common questions. In addition, fairness and procedural concerns weigh in favor of decertification because the class is not sufficiently numerous and the individual issues will lead to a series of mini-trials, one for each named and unnamed plaintiff. For these reasons, KBK respectfully requests that this Court decertify the FLSA collective action.

## PROCEDURAL HISTORY

On May 15, 2015, Plaintiffs Andrew Ricard and Craig Melville filed their Complaint asserting wage claims under the FLSA and state law on behalf of themselves and a putative collective class (and a Rule 23 class for their state law claims). (ECF #1.) On August 24, 2015, Plaintiffs filed an Amended Complaint adding Plaintiff Tim Mackey as a named plaintiff for the FLSA and state law claims. (ECF #11.) On October 9, 2015, Plaintiffs filed a Second Amended Complaint, removing Plaintiff Craig Melville and adding several new allegations regarding purportedly uncompensated working time. (ECF # 24.) Finally, on November 3, 2015, Plaintiffs filed a Third Amended Complaint, the current operative pleading, asserting an FLSA retaliation claim on behalf of Plaintiff Ricard. (ECF # 39.) The only cause of action in Plaintiffs' Third Amended Complaint subject to a potential collective action is Count I, seeking overtime pay under the Fair Labor Standards Act. (*Id.* at ¶ 47-61.)

On December 15, 2015, Plaintiffs filed a Motion for Conditional Certification. (ECF #53.) The parties stipulated to conditional certification and for notice to be sent to "current or former employee[s] of KBK Services Inc. who worked on a KBK jobsite on or after May 19, 2012." (ECF #67.) The notice will be sent to a total of 27 individuals, including former named plaintiff Craig Melville. (*Id.*) This means that, at most, the putative collective action class could

consist of 29 individuals, provided every single potential class member joins the class. The notice gives these individuals 50 days to join the class. (*Id.*) As of the filing of this motion, the time for individuals to join the class has not yet concluded.[1]

## STATEMENT OF FACTS

KBK is a Wisconsin company that performs sheetmetal, steamfitting, and plumbing work on construction projects in northwestern Wisconsin. (Declaration of Kenneth C. Kontny ("Kontny Decl."), ¶ 2.) KBK's main office and shop are located in Ashland, Wisconsin. (*Id.* at ¶ 3.) KBK employees are assigned to construction projects throughout northwestern Wisconsin where they work for a period of time that could range from several days to several months. (*Id.* at ¶ 4.) Each project has a foreman that manages the project. (*Id.* at ¶ 5.)

KBK employees generally work forty hours per week over four to five days at the jobsite, depending on the needs of the project as determined by the foreman. (*Id.* at ¶ 6.) The start and end times may vary week-to-week or project-to-project. (K. Kontny Dep. at 47:2-21.) (A copy of the transcript of the deposition of Kenneth C. Kontny was previously filed in this case. (ECF #62.)) Generally, KBK employees keep track of their own hours and provide their time to the office manager at the end of the week.[2] (Kontny Decl., ¶ 7.) The time was either provided via a formal timecard or by submitting an e-mail to JoAnn Kontny. (J. Kontny Dep. at 38:20-25.)

---

[1] KBK anticipates that very few, if any, current or former employees of KBK will consent to join the putative class action. Given this potential, KBK reserves the right to raise additional arguments in support of decertification once the time to join the class has concluded. As an alternative, KBK requests that the Court consider holding this motion in abeyance until the number of putative class members is determined. *See Elder v. Comcast Corp..,* No. 12 C 1157, 2015 WL 3475968, at *5 (N.D. Ill. June 1, 2015) (generally decertification is evaluated after members of the collective action have opted in so that the Court knows which employees will be part of the class).

[2] For a period of time, KBK used a key fob system for verification of the time card entries on certain projects. (Kontny Decl., ¶ 8;K. Kontny Dep. at 34:6-35:13.) KBK no longer uses the key fob system and is unable to access prior records from that system given a computer crash at KBK's office. (Kontny Decl., ¶ 9; K. Kontny Dep. at 34:6-35:13;  J. Kontny Dep. at 22:16-23:7.) (A copy of the transcript of the deposition of JoAnn Kontny was previously filed in this case. (ECF #64.))

Each KBK foreman is responsible for driving a company truck to the jobsite on Monday morning that contains needed materials and supplies. (Kontny Decl., ¶ 10.)The company truck is loaded with materials and supplies for the week when the foreman arrives on Monday morning. (*Id.* at ¶ 11; K. Kontny Dep. at 21:21-22:1.) The foreman will usually keep the truck until Thursday night or Friday, at which time the foreman will bring the truck back to the company shop. (Kontny Decl., ¶ 12.) Once the company truck is returned to the shop, shop employees load the truck with supplies and materials for the next week. (*Id.* at ¶ 13.) The shop foreman, Ryan Pralle, testified that he cannot recall an instance where shop employees were unable to have all trucks loaded in time to leave on Monday morning. (Pralle Dep. at 26:9-15.) (A copy of the transcript of the deposition of Ryan Pralle was previously filed in this case. (ECF #61.))

The foreman generally picks up the company truck on Monday morning at the shop in Ashland. (Kontny Decl., ¶ 14.) KBK employees, however, are not required to meet at the shop on Monday mornings but instead meet at the jobsite. (*Id.* at ¶ 15.) KBK foremen are allowed to drive other KBK employees to the jobsite in the truck but are not required to do so. (*Id.* at ¶ 16; K. Kontny Dep. at 15:1-6; 17:18-25; Truchon Dep. at 26:18-25.)[3] In that situation, employees may meet at the KBK shop to carpool or be picked up by the foreman along the way. (Kontny Decl., ¶ 17.) The determination of how to get to the jobsite, whether driving in a personal vehicle or riding in the foreman or another employee's vehicle, is within each individual employees' discretion. (*Id.* at ¶ 18.)

At the end of the day, when KBK employees finish their work at the jobsite, KBK employees may drive home, stay at KBK's Medford, WI shop or stay overnight at a motel. (*Id.* at ¶ 19; K. Kontny Dep. at 67:12-15.) Employees make their own determination as to what to do at

---

[3] A true and correct copy of the transcript of the deposition of Frank Truchon is attached as Exhibit A to the Declaration of John H. Zawadsky.

the end of each day. (Kontny Decl., ¶ 20.) Employees working on projects near the Medford shop are allowed to stay overnight at the Medford shop but are not required to stay there. (*Id.* at ¶ 21.) KBK foremen may stay overnight at a motel during the workweek and KBK will pay for the foreman's motel room. (*Id.* at ¶ 22; K. Kontny Dep. at 30:13-15.) KBK foremen are allowed, in their own discretion, to allow employees to stay with them in their motel rooms. (Kontny Decl., ¶ 23; K. Kontny Dep. at 8-12.) KBK does not have any policy requiring employees to stay overnight near the jobsite. (Kontny Decl., ¶ 24.) Because KBK does not govern or manage what employees do after their shift ends, KBK has no records of whether employees drive home after work or stay at either a motel or the Medford shop. (*Id.* at ¶ 25; K. Kontny Dep. at 21:7-11.)

Plaintiffs' Complaint asserts that Plaintiffs are entitled to compensation under the FLSA for time Plaintiffs spent commuting to and from construction projects that were allegedly "away from their home communities," for performing principal activities before or during such travel, for working at the company shop, and for overtime pay. (ECF No. 39, ¶ 1.) KBK denies that the employees are entitled to such compensation.

## APPLICABLE LEGAL STANDARDS

The certification process for a collective action under the FLSA is a two-step process. *Viveros v. VPP Grp., LLC*, No. 12-CV-129-BBC, 2013 WL 3733388 at *3 (W.D. Wis. July 15, 2013) (citations omitted). At the first step, conditional certification, plaintiffs must make a modest showing that they are similarly situated to potential class members and that they all were victims of a common policy that violated the law. *Id.* It is undisputed that a class was conditionally certified in this matter. (ECF # 67.)

The second step for certifying a class under the FLSA occurs at the close of discovery on a motion for decertification by the defendant. *Id.* The Court applies a more stringent standard at the second stage of the inquiry. *Allen v. City of Chicago*, No. 10 C 3183, 2014 WL 5461856, at

*2 (N.D. Ill. Oct. 22, 2014). It is at this step that the court determines "whether the plaintiffs are similarly situated in fact to those who have opted in." *Viveros*, 2013 WL 3733388 at *3. The FLSA does not define the phrase "similarly situated." *Russell v. Ill. Bell. Tele. Co.*, 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010). The Court, however, considers: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp.2 d 759, 762 (N.D. Ill. 2004).

The burden is on plaintiffs to present evidence "demonstrating the continued propriety of maintaining the class action." *Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 WL 2457956, at *2 (N.D. Ill. June 6, 2013) (quoting *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003)). If plaintiffs cannot meet their burden and show that they are similarly situated, the court then decertifies the collective action. *Bitner v. Wyndham Vacation Resorts, Inc.*, 301 F.R.D. 354, 358 (W.D. Wis. 2014). The named plaintiffs are then able to continue pursuing their claims for resolution on an individual basis.

In 2013, the Seventh Circuit held that when evaluating a proposed collective class under the FLSA, courts must also consider whether the proposed collective action meets the requirements set forth in Fed. R. Civ. P. Rule 23. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013). The Seventh Circuit noted that the difference between collective actions under the FLSA and class actions under Fed. R. Civ. P. Rule 23 is whether or not members must opt-in to the suit or must opt-out to avoid being bound by the judgment or settlement. *Id.* at 771. The Court then stated that there was no "good reason to have different standards for the certification of the two different types of action, and the case law has largely

merged the standards, though with some terminological differences." *Id*. at 772. As such, courts in this Circuit have applied the requirements set forth in Fed. R. Civ. P. Rule 23 to collective actions under the FLSA. *Viveros*, 2013 WL 3733388 at \*4*; see also Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010) (referring to commonality and predominance when considering certification of a class under the FLSA).

## ARGUMENT

The named plaintiffs are seeking to represent a class of current and former KBK employees to assert claims against KBK under the FLSA. As an initial matter, this class should be decertified because there are serious questions as to the adequacy of representation, both the named plaintiff and the counsel for the putative class that alone justify decertification.

In addition, plaintiffs' claims are not appropriate for collective resolution. Plaintiffs sought conditional certification of a collective action on four separate claims for purportedly uncompensated working time falling under the umbrella of FLSA claims. The four issues are:

- **Issue One**: Whether KBK must pay for time spent traveling to or from jobsites not within the employees' "home community" at the beginning and end of the day;

- **Issue Two**: Whether KBK must pay for time spent traveling to or from jobsites not within the employees' "home community" when that travel time cut across the employees' regular working hours;

- **Issue Three**: Whether KBK must pay any employees wages for time spent delivering men, materials and supplies to jobsites; and

- **Issue Four**: Whether KBK must pay any employees wages for their travel time to a jobsite where that employee loaded materials into the truck before driving or riding to the jobsite.

(ECF #54 at 4-14.)

As discussed in detail below, none of these issues are appropriate for continued certification as a collective action because they are not able to be resolved on a collective basis using representative evidence to answer common questions. Plaintiffs' claims do not arise from a

company-wide policy but instead arise from the fact-specific circumstances of each employee. In order to establish liability, damages and the applicability of any defenses that KBK has, the Court will need to hear individual testimony from every single plaintiff, both named and opt-in, which will turn this action into a series of mini trials. In addition, fairness and procedural concerns do not support certification of the class.

Plaintiffs also seek certification of their claim that KBK failed to properly calculate overtime pay under the FLSA. (ECF #54 at 15-18.) Plaintiffs, however, cannot serve as representatives for this claim; they are not a member of the class that they propose to represent because they do not have a claim for miscalculated overtime wages that has not expired. For these reasons, the Court should grant KBK's motion to decertify the class.

## I.     Plaintiff Mackey and Plaintiffs' Counsel Cannot Adequately Represent the Class.

This district takes into consideration whether the named plaintiffs and class counsel would be adequate under Rule 23 when making a determination on certification of a collective action. *Viveros*, 2013 WL 3733388 at *9. The adequacy requirement has three elements: (1) the class representative cannot have antagonistic or conflicting claims with other members of the class; (2) the class representative must have a sufficient interest in the litigation to ensure vigorous advocacy;[4] and (3) class counsel must be "competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously." *Wagner v. NutraSweet Co.*, 170 F.R.D. 448, 451 (N.D. Ill. 1997) (citations omitted).

---

[4] There is a question as to whether either named plaintiff has a sufficient interest in the litigation to ensure vigorous advocacy as both named plaintiffs left KBK in fall 2013. (Ricard Dep. at 6:9-12 (left KBK in September 2013); Mackey Dep. at 6:5-7 (left KBK in October 2013).) Given the lack of any evidence of willful violations, plaintiffs are likely subject to a two year statute of limitations that go back to May 2013. This would limit named plaintiffs to damages for purported violations that occurred over a time span of only 5-6 months.

**A.    Named Plaintiff Mackey is Not an Adequate Representative and Should Not Be Allowed to Represent the Class.**

The named plaintiff must be a "conscientious representative plaintiff." *Forrest v. Shenandoah Valley Nat. Park*, No. 06-C-11, 2007 WL 1029503 at *3 (E.D. Wis. Mar. 28, 2007) (quoting *Rand v. Monsanto Co.*, 926 F.2d 596, 599 (7th Cir. 1991). In *Forrest,* the Court found that the proposed class representative demonstrated a lack of credibility because in her deposition, she was unable to correctly answer questions about prior lawsuits she had filed and did not know the status of the lawsuit at issue. *Id.* at *4. The Court noted that regardless of whether she did not remember, made a mistake or was being untruthful, she was not an adequate representative given her lack of knowledge and credibility problem. *Id.* Other courts have similarly underscored the importance of having a credible representative plaintiff, stating that "the interests of a proposed class cannot be fairly and adequately represented by a party who is not willing to be entirely open and candid in discovery." *Greene v. Brown*, 451 F. Supp. 1266, 1275 (E.D. Va. 1978) (named plaintiff was inadequate where she suffered a lack of memory as to the events and circumstances surrounding the filing of her lawsuit and was evasive and unable to remember details regarding financing of the lawsuit).

At his deposition, Tim Mackey provided only evasive answers when counsel attempted to question him regarding his criminal history. When counsel asked details about the convictions, after initially recognizing that he had been convicted of two disorderly conducts, Mackey became defensive and refused to answer questions.

Q:    When did you get disorderly conducts?

A:    I don't know. Does that have anything to do with why we're here today?

Q:    Once again, let me ask the questions.

A:    Once again, I'm not going to answer that question.

Q:      You're refusing to answer the question?

A:      I'm not answering. It has nothing to do with what we're doing here today, a disorderly conduct.

(Mackey Dep. at 83:19-84:2.)[5]

After this exchange, Mackey took a break as requested by Attorney Ho. After the break, Mackey changed his response from refusing to answer the questions to stating that he did not recall any incidents of being convicted of disorderly conduct or criminal trespassing. (Mackey Dep. at 84:12-85:14.) This directly contradicted his prior testimony in which he stated that he *had* been convicted of disorderly conduct. (*Id.* at 83:9-11.)[6]

Based on the evasive testimony Mackey provided in his deposition, this Court should find that Mackey is not an adequate plaintiff to serve as a representative for the collective class. Although a criminal history would not necessarily disqualify Mackey from acting as a Named Plaintiff, his evasive answers regarding his criminal history provided at his deposition demonstrate a lack of credibility. Further, Mackey's ability to advocate for an entire class is questionable. At the time of his deposition, Mackey was not even aware that he was suing KBK for purportedly miscalculating overtime wages. (Mackey Dep. at 46:7-19.) Mackey's failure to respond with candor to these questions, whether intentionally evasive or due to lack of memory, and his lack of knowledge about the case raises serious questions as to his ability to fairly and adequately represent the collective class, and based on this Mackey should be removed as a representative plaintiff.

---

[5] A true and correct copy of the transcript of the deposition of Tim Mackey is attached as Exhibit B to the Declaration of John H. Zawadsky.

[6] This incident also raises further questions as to Attorney Ho's representation, whose adequacy to act as class counsel is addressed in additional detail in Section I.B.

**B.      The Class Should Be Decertified Because Class Counsel is Not Adequate to Represent the Putative Class.**

In addition to assessing the adequacy of the named plaintiff, the Court inquires as to the adequacy of class counsel. This inquiry is of "extreme importance" due to the "broad binding effect of class action judgments." *O'Neill v. Gourmet Sys. of Minnesota, Inc*., 219 F.R.D. 445, 454 (W.D. Wis. 2002) (quoting 7A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1769.1, at 374, 383). The Court considers unethical conduct by class counsel because class counsel acts as a fiduciary for the unnamed plaintiffs. R*eliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 495 (7th Cir. 2013). Thus, when "class counsel have demonstrated a lack of integrity" through misconduct and unethical action, "a court can have no confidence that they will act as conscientious fiduciaries of the class." *Id.* (internal citations and quotations omitted) (further stating that serious or major ethical violations, even where they do not prejudice the class, can require denial of class certification); *see also Viveros,* 2013 WL 3733388 at *10 (addressing concerns about class counsel including, among other things, counsel's failure to submit a proposed class notice with the motion for conditional certification)[7].

It is undisputed that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Harkins v. Riverboat Servs., Inc*., 385 F.3d 1099, 1101 (7th Cir. 2004) (quoting 29 U.S.C. § 216(b)). The Seventh Circuit has noted that being actually named as a plaintiff in a Complaint and participating discovery does not act as a substitute for the consent or as presumed consent. *Id.* (dismissing plaintiffs that were named in the action but for which no

---

[7] Class counsel failed to file the proposed class notice with plaintiffs' motion for conditional certification. (Zawadsky Decl., ¶ 12.) This error was not rectified until KBK's counsel alerted class counsel to the issue and requested a copy of the proposed notice. (*Id.*) To KBK's knowledge, the proposed class notice has never been filed with the Court. (*Id.*) A proposed notice was filed with the Court by KBK along with the parties' stipulation as to conditional certification. (*Id.*)

consents were filed with the Court). The failure to obtain and file consents in the action can have a clear prejudicial effect on both named and unnamed plaintiffs. The failure to obtain FLSA consents for a named plaintiff is particularly egregious in an FLSA case because it raises doubt as to whether plaintiffs' counsel will adequately to notify and represent class members in the future.

In the instant case, counsel seeking certification of the collective action has engaged in conduct throughout this litigation that raises serious doubt as to he and his firm's ability to adequately represent the putative class. The most egregious of this conduct is the failure to obtain an FLSA consent signed by Craig Melville, who was a Named Plaintiff in this lawsuit when it was originally filed on May 19, 2015. (ECF #1.) To be named as a party in this lawsuit, counsel should have already obtained an FLSA consent from Melville. Such consent, however, was not filed with the Complaint. Instead, the Complaint avoided this problem by stating that "[a] copy of the FLSA consent signed by Plaintiff Melville will be filed with the Court as soon as possible." (*Id.* at ¶ 6.) This statement, in a pleading signed by Attorney Ho, implied that Melville had already signed an FLSA consent. This would later prove to be a misrepresentation.

Over three months later, Attorney Ho filed an Amended Complaint that continued to name Melville as a Plaintiff. (ECF #11.) An FLSA consent form had not been filed with the Court as represented in the original Complaint. Instead, the Amended Complaint continued to avoid addressing counsel's failure to obtain a consent form from Melville. The Amended Complaint stated: "FLSA consents signed by Plaintiffs Ricard and Mackey have already been filed with the Court. Wisconsin prevailing wage claim consents signed by Plaintiffs Ricard and Mackey are attached to this First Amended Complaint." (*Id.* at ¶ 6.) The Amended Complaint completely ignored the fact that Melville's consent form has never been filed. A Second

12

Amended Complaint, removing Melville as a named plaintiff was not filed until October 9, 2015. (ECF #24.)

KBK issued a discovery request to Plaintiffs requesting that Plaintiffs provide documents showing that Melville consented to file this lawsuit. (Zawadsky Decl., ¶ 5, Ex. C at 3.) Plaintiffs responded by noting that there were "no responsive documents to this request, aside from documents that have already been filed with the Court, and are available on the ECF website." (*Id.*) No consent signed by Melville was ever filed with the Court. In fact, Melville admitted at his deposition that he never signed a consent form to participate in the federal court suit. (Melville Dep. at 71:4-6.)[8] Melville also testified that he had not reviewed the Complaint prior to his deposition, which occurred six months after the Complaint had been filed. (*Id.* at 69:13-23.)

This leads to the conclusion that Attorney Ho filed a lawsuit on Melville's behalf *without obtaining the legally-required consent* and then impliedly representing to this Court that he did have consent despite knowing otherwise. Attorney Ho then allowed Melville to remain as the named plaintiff in this lawsuit for almost five months. Such conduct violates the Wisconsin Supreme Court rules governing the professional conduct of attorneys. *See* Wis. Sup. Ct. R. 20:3:3(a) ("A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.")

Attorney Ho's representation of Melville at his deposition further calls into question Attorney Ho's adequacy to act as counsel. At the beginning of Melville's deposition, counsel for KBK asked Melville if he was being represented by Attorney Ho for the deposition. (Melville Dep. at 6:5-7.) Melville stated that he was not represented by Attorney Ho. (*Id.*) Attorney Ho

---

[8] A copy of the transcript of the deposition of Craig D. Melville was previously filed in this case. (ECF # 60.))

was present for the deposition and did not interject or otherwise express any disagreement or confusion over Melville's response. However, approximately halfway through the deposition, after a break in the deposition, Melville sought to clarify that Attorney Ho was representing him. (*Id.* at 35:25-36:14.) The representation did not begin during the deposition, and Melville further testified that he had made arrangements with Attorney Ho to represent him at his deposition when he had been initially served with the papers for the deposition. (*Id.* at 36:15-19.) Therefore, Attorney Ho was aware at the time when Melville stated that he was not represented by Attorney Ho that this statement was false.[9] Melville further testified that, despite not being a party to this action, he was not paying Attorney Ho to represent him for the deposition. (*Id.* at 37:22-24.)

As noted above, Attorney Ho represents the two named plaintiffs, the formerly named plaintiff, Craig Melville, and is seeking to represent the putative class. In addition, however, Attorney Ho also represents a number of third party witnesses in this matter. Attorney Ho represents the UA Plumbers and Steamfitters Local 434, the International Association of Sheet Metal, Air, Rail and Transportation Workers Local 18 and the Wisconsin Pipe Trades Association and as a result, he represented Terry Hayden, Roger Jackson and Gerald Jackson in his capacity as counsel for those entities. (Zawadsky Decl., Ex. D-F.) Wisconsin Pipe Trades representative Gerald Jackson encouraged both named plaintiffs and formerly named plaintiff Melville to sue KBK and introduced them to Attorney Ho.[10] (Mackey Dep. at 34:12-35:14; Ricard Dep. at 41:1-15; 43:22-8; Melville Dep. at 45:2-46:9.)[11] Attorney Ho's expansive

---

[9] The only other possibility is that Attorney Ho was not representing Melville at the start of the deposition but used the break to change that so he could assert objections on Melville's behalf. This would. However, render Melville's testimony as to the start of Attorney Ho's representation (when he was served with the deposition notice) false.

[10] Gerald Jackson testified that Attorney Ho asked Jackson to ask potential plaintiffs, such as Ricard and Mackey, to contact Attorney Ho. (Zawadsky Decl., Ex. E at 9:8-10:16; 56:2-16.)

[11] A true and correct copy of the transcript of the deposition of Andrew Ricard is attached as Exhibit G to the Declaration of John H. Zawadsky.

representation of multiple parties and third party witnesses in this lawsuit raises a question as to whether there is a potential conflict between the interests of the plaintiffs (and putative plaintiffs) and the unions that Attorney Ho represents.

Class counsel is expected to act as a fiduciary for both named and unnamed plaintiffs and the Court must be ensured that counsel will notify and represent the plaintiffs. Class counsel's conduct in the initial stages of this litigation raise red flags as to whether counsel has the necessary integrity and candor to be adequate class counsel. Counsel represented to the Court in its initial filing that Melville had signed a consent, agreeing to be a named plaintiff in the action. Counsel maintained this representation for almost 5 months until removing Melville as a Plaintiff in the Second Amended Complaint. However, it is clear that counsel never obtained a consent for Melville and instead, filed this action without Melville's consent. Class counsel failed to file a proposed class notice with its motion for certification and never corrected this error. Further, counsel failed to fully disclose facts that arose at Melville's deposition and knowingly allowed Melville to testify falsely as to his representation, a matter wholly within counsel's knowledge. This lack of integrity warrants decertification of the putative FLSA class.

**II.    Plaintiffs Cannot Meet Their Burden of Demonstrating that They are Similarly Situated for Purposes of Maintaining Certification as an FLSA Collective Action.**

Plaintiffs bear the burden of showing not just that there has been a potential FLSA violation but that there is "an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws." *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 346 (N.D. Ill. 2012)(internal citation and quotation omitted). Although this factual nexus does not require that the claims be identical, certification of a collective class is inappropriate where in order to determine whether each plaintiff has a viable claim "requires a detailed, fact-specific inquiry." *Id*. Here, not only is there no common policy or practice, all four

issues in this case will require individual proof for each named plaintiff and opt-in plaintiff in order to determine both liability and damages. Given the inability to resolve the issues in this action via representative proof or on a common basis, the representative plaintiffs and any opt-in plaintiffs are not "similarly situated."

> **A.      Plaintiffs and the Putative Class are not "Similarly Situated" Because Their Allegations Do Not Arise from a Common Policy or Practice that Violated the Law.**

A critical issue with certification of the proposed class is that Plaintiffs cannot establish that they were subject to a uniform policy or practice that violated the law. In FLSA actions, plaintiffs typically must "produce substantial evidence of a single decision, policy or plan" in order to justify proceeding as a collective class. *Mielke*, 313 F. Supp. 2d at 763 (citation omitted); *see also Hawkins v. Alorica, Inc.,* 287 F.R.D. 431, 440-41 (S.D. Ind. 2012) (denying FLSA certification because evidence showed that there was no company-wide policy requiring pre-and post-shift work but the evidence showed that only certain supervisors required such work). The Seventh Circuit has been clear that certification is appropriate only where there is a company-wide policy as opposed to allegations of supervisor-level practices. *Vang v. Kohler Co.*, 488 F. App'x 146, 147 (7th Cir. 2012) (ordering district court to determine whether the suit at issue "concern[ed] one firm-wide policy or a congeries of supervisor-level practices"); *see also Camilotes*, 286 F.R.D. at 351 (granting defendant's motion to decertify the class noting specifically that there was no evidence of a system-wide policy, instead policies were implemented department-by-department within the supervisors' discretion).

In addition, the "common policy" must be a policy that in and of itself violates the FLSA. *Camilotes*, 286 F.R.D. at 350 (a policy that does not violate FLSA does not warrant certification of a collective action). In *Creal v. Group O, Inc.*, the Court found that the plaintiffs failed to assert a common policy or plan that violated the law where plaintiffs based their certification on

16

the defendant's rounding policy. *Creal v. Grp. O, Inc.*, No. 13 C 4275, 2016 WL 98566, at *4 (N.D. Ill. Jan. 8, 2016). The court noted that the law did not proscribe rounding policies generally but only addressed their implementation (by proscribing rounding policies that would, over time, fail to compensate employees properly). *Id.* Because plaintiffs' common policy was merely the rounding policy and not a company-wide implementation of this policy, it could not serve as a basis for a collective action because it did not, in and of itself, violate the FLSA. *Id.*

### 1.   KBK's Policy on Commuting Time Does Not Violate the Law and Therefore Cannot Be the Basis for a Collective Action.

The only common policy for which there is any evidence in the record is a policy that does not violate the FLSA, namely, that KBK does not pay its employees for time spent commuting to and from work. (K. Kontny Dep. at 14:17-21; *see also* 29 C.F.R. § 785.35.) Plaintiffs appear to rely on this policy as the common policy on which certification of all other issues is appropriate. (ECF #54 at 4.) However, this policy is a lawful policy pursuant to 29 C.F.R. § 785.35 and, as in *Camilotes* and *Creal*, cannot serve as the basis for a collective action.

### 2.   There is no Evidence that KBK has a Policy Requiring Employees to Stay Overnight when Working on Projects Outside Their Home Communities.

The purported policy that plaintiffs are actually disputing is that KBK requires employees to stay overnight when working on projects outside the employee's home community. (*see* ECF #39 at ¶ 65 (Plaintiffs' Third Amended Complaint alleges that KBK employees "were expected by KBK to have an overnight stay away from home"). This would convert the time commuting (falling under 29 C.F.R. § 785.35 as ordinary home-to-work travel) to "travel that keeps an employee from home overnight" pursuant to 29 C.F.R. § 785.39. The reason that plaintiffs do not expressly state that they are challenging an overnight policy is because there is no evidence that KBK actually has such a policy.

Instead, the evidence demonstrates that there was no company-wide policy, or even supervisor-specific rules, that forced employees to stay overnight. Instead, foreman Frank Truchon testified that it was not typical for employees to stay near the job site. (Turchon Dep. at 10:23-11:5.) President of KBK, Kenneth "Chris" Kontny testified that employees may stay near the site but did not testify that there was a company policy requiring an overnight stay. (K. Kontny Dep. at 34:1-5.) Further, Named Plaintiff Mackey admits that they were not required to stay at a motel or overnight. (Mackey Dep. at 47:11-48:3.) It is apparent that there is no common policy regarding overnight stays.

The purported company-wide policy requiring overnight stays, of which there is no evidence, is also the common policy underlying the second issue, which seeks compensation for commuting time that cuts across the work-day. Again, the only policy for which there is evidence in the record is KBK's lawful policy on commuting time. Like the first issue, the second issue actually asserts that Plaintiffs are not commuting but are engaged in travel away from home overnight. This requires that KBK had a policy requiring employees to stay overnight on certain projects. As noted above, there is no support of a company-wide policy regarding forced overnight stays that led to FLSA violations. There is no common policy underpinning the second issue and, as such, it is not appropriate for adjudication on a collective basis.

3. **Plaintiffs Cannot Establish a Company-Wide Policy Requiring Employees to Load Materials at the Shops and to Not Seek Payment for that Work.**

The third and fourth issues involve work allegedly completed before commuting to jobsites, while traveling to the jobsite or performed after commuting back to either the Medford or Ashland shop. Plaintiffs are required to show that there is a company-wide policy that KBK did not pay its employees for loading and unloading materials at the shops and/or for driving materials, supplies and personnel to the jobsites. Plaintiffs cannot, however, present any evidence

of such a policy. Neither of the KBK representatives testified that there was a policy prohibiting employees from requesting payment for that work or a company-wide policy for KBK not to pay employees for that work. Plaintiff Mackey testified that he just "pretty much kn[e]w" that KBK would not pay for time spent loading, yet he does not point to any specific person or policy. (Mackey Dep. at 65:19-66:6.) The only other evidence of a purported policy came from named plaintiff Ricard in his deposition where he stated that he was instructed by the foremen to not count loading time as working time, however, the only foremen he could recall making this statement was Frank Truchon. (Ricard Dep. at 29:1-12.) An alleged order given by a single foremen is hardly evidence of a common policy. *See Franks v. MKM Oil, Inc.,* No. 10 CV 00013, 2012 WL 3903782, at *8 (N.D. Ill. Sept. 7, 2012) (noting that purported common policy was neither widespread nor prevalent and as such, not suitable for class treatment). At best, plaintiffs are asserting that there is a supervisor-level order that may or may not have led to an FLSA violation. This is not, however, "substantial evidence of a single decision, policy or plan" that meets plaintiffs burden of providing the justification for proceeding as a collective class. Because there is no unlawful common policy or practice that relates to any of plaintiffs' four FLSA issues, there is no basis for certifying a collective action and the conditionally certified class should be decertified.[12]

**B.     Plaintiffs are Not Similarly Situated Because Highly Individualized Inquiries are Necessary to Establish Liability and Damages.**

Class treatment is also not appropriate because each of the four issues will require an individualized inquiry regarding damages. Courts in this circuit have noted that if there is no way to resolve the claims of each class member without independently establishing the facts that

---

[12] Even if the Court finds that there is a common policy as to even one of the issues, at the decertification stage, simply asserting a common policy, by itself, is insufficient to maintain certification. *Creal,* 2016 WL 98566 at *4. At this stage, the plaintiffs must be also similarly situated in terms of their factual claims, which plaintiffs here are not as described in detail in Section I.B . *Id.*

apply to that specific plaintiff, then there is no way to resolve the matter on a representative basis. *Aguilera v. Waukesha Mem'l Hosp., Inc.*, No. 13-C-1245, 2015 WL 3791469, at *8 (E.D. Wis. June 18, 2015). Such individualized inquiries cannot be resolved on a representative basis because the fact finder cannot hear the testimony of the representative plaintiff(s), make the necessary determinations and then extrapolate to reach conclusions about the other class members. *Id.* (granting a decertification motion where no common policy dictating communication device use during meal breaks existed and facts would have to be established independently as to each plaintiff).

The Seventh Circuit has also recently underscored the fact that individualized issues weigh against certification, specifically on the issue of damages. *Espenscheid*, 705 F.3d at 773. In *Espenscheid,* although plaintiffs asserted that damages could be shown via representative testimony, the Court held that it would not be appropriate in that case because as the class members' circumstances were not uniform. *Id.* at 774. Indeed, the issue of individualized damages required there to be a separate evidentiary hearing for every single plaintiff. *Id.* at 773. Neither the defendant nor the plaintiffs in *Espenscheid* had records of time worked but not included on their time sheets. *Id.* at 774-75. There is no evidence in this case that plaintiffs maintained records of time worked but not included on their time sheets. Plaintiffs would bear the burden of establishing their unreported time and this could not be done via representative testimony. *Id.* at 775. Instead, it would require each plaintiff to reconstruct from memory, infer from the particulars of the job or estimate in other ways the time that was not reported. *Id.* Here, it is apparent that the time for which plaintiffs are seeking compensation varied by week and by job. As such, there is no way to extrapolate the amount of uncompensated time purportedly owed

to each plaintiff. Based on the predominance of individual issues over common questions, the appellate court upheld the district court's decertification. *Id.* at 777.

> 1.   **The Determination of Liability and Damages for the Purported Overnight Travel Will Require Individual Testimony from Every Plaintiff.**

The first two issues, claiming that employees are entitled to be paid for time spent commuting to work when it is "outside the home community" and for commuting to and from work when that time cuts across the workday will require a determination of numerous individual issues to determine both liability and damages. For example, the fact finder will need to know where each individual lived (or commuted from) at that specific time he worked on each KBK project. Assuming *arguendo* that plaintiffs are even entitled to compensation for commuting to certain job sites, some plaintiffs will not qualify as having traveled outside their home community as evidence in the record suggests that some employees, such as those on Medford-area projects also lived in Medford. (Mackey Dep. at 78:16-25.) In addition, Ricard testified that while working on a project in Eau Claire, he was living in Bloomer, Wisconsin, which is within 30 miles of his jobsite and undermines his argument that he is entitled to compensation for purported overnight travel. (Ricard Dep. 35:18-36:6.)

Other issues that will affect whether the time is compensable include whether the employee was driving or was riding as a passenger; and whether the time in which the employee was commuting was outside of normal work hours (which may vary not only by job by but week on a particular job). KBK does not keep records of how employees get to and from the jobsite nor is there any evidence that employees kept their own records of their travel. (K. Kontny Dep., ¶ 25.) KBK foreman Frank Truchon stated that the foreman does not keep track of employees after work because after they punch out, where they go or where they stay is not KBK's business. (Truchon Dep. at 11:24-12:4.) Because each employee was allowed to determine their mode of

transportation, and because it was not consistent every day, there is no way to use representative testimony to establish the liability and damages as to the first two issues and, as such, these issues are inappropriate for resolution on a class-wide basis. (Mackey Dep. at 21:13-22:3 (noting sometimes Mackey drove his personal vehicle to the jobsite, sometimes he rode with the foreman and sometimes he carpooled with another employee); Ricard Dep. at 23:25-:24:4 (most times Ricard drove his personal vehicle but on rare occasions he would ride with the foreman).)

**2.    Because There are No Records of When Employees Loaded Trucks Prior to Commuting to Work, Individual Testimony from Every Plaintiff Will Be Needed to Establish Liability and Damages.**

The third and fourth issues deal with work purportedly done before, during or after the commute to the jobsite. Like the first two issues, however, there is no way to resolve these issues on a representative basis or class-wide basis. There was no company-wide policy requiring plaintiffs to load trucks before or after their shifts and/or barring plaintiffs from reporting any of this time. Similarly, there was no policy requiring employees to transport anything other than themselves to their jobsites and no company policy from barring the reporting of time spent delivering supplies, materials and/or personnel. As to preliminary or postliminary work, Melville testified that although he may have attended meetings prior to his starting time, he did not count them as work time but this was not because he was instructed that he could not do so. (Melville Dep. at 83:6-16.)

Further complicating adjudication of these issues is that there are no records of the unreported time. On the majority of jobs, plaintiffs did not clock in but instead subsequently provided KBK with time cards documenting the hours worked via e-mail. (Melville Dep. at 32:5-15; 33:7-23; Ricard Dep. at 63:2-5.) At least one named plaintiff, Ricard, has noted that his timecards may not be accurate. (Ricard Dep. at 30:4-18.) Ricard further testified that he did not record his time when he was allegedly loading materials at the Medford shop. (Ricard Dep. at

55:15-54:23.) As such, each plaintiff who is claiming that he is entitled to payment for preliminary or postliminary work would be required to somehow reconstruct or estimate the amount of unreported time. This is the same type of individualized fact determinations that requires separate evidentiary hearings for each plaintiff. These issues cannot be determined by extrapolating the testimony of representative plaintiffs because there is no uniformity of circumstances.

In addition to these individualized issues, there are individualized defenses available to KBK, which weigh in favor of decertification. *Camilotes*, 286 F.R.D. at 352. Affirmative defenses undermine a collective action where they cannot be applied across the board to plaintiffs. *Id.* Like in *Camilotes*, an individualized inquiry would be necessary to determine whether KBK had actual or constructive knowledge of any work performed by KBK employees before or after commuting to or from the jobsite. KBK foreman Frank Truchon testified that the trucks were usually loaded when he would arrive on Monday morning and he has no recollection of ever having to call in KBK employees to help load the company truck. (Truchon Dep. at 31:22-24, 36:15- 17.) Plaintiff Mackey testified that KBK was entitled to rely on his timecards and he does not know how KBK would know if he worked more hours than he had listed on his time card. (Mackey Dep. at 80:5-18.)

It appears from the record that any such time would not have been recorded and would have to be reconstructed from each plaintiff's memory. Then, as to each episode where work was purportedly performed, that particular plaintiff would also have to demonstrate KBK's actual or constructive knowledge. This adds on additional individual inquiries that must be made to each particular plaintiff. It is apparent that given the nature of the claims, plaintiffs cannot meet their burden to show that the plaintiffs and the putative class are similarly situated. Instead, it is clear

that the factual differences will require individualized hearings, which are the antithesis of a collective action.

> **C.      Plaintiffs are Not Similarly Situated to the Putative Class Because They are Not Members of the Class They Proposed to Represent.**

An implicit requirement of being a representative plaintiff is that the named plaintiff have standing to represent the class. *Blihovde v. St. Croix Cty.*, Wis., 219 F.R.D. 607, 614 (W.D. Wis. 2003). This is a threshold requirement because the representative plaintiffs must be "sufficiently interested so that full litigation of the issues involved is assumed." 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 1785.1, at 139 (2d ed.1986)). If plaintiffs are not members of the proposed class, then they do not have claims typical of the potential class members. *Id.*

Here, plaintiffs asserted in the motion for conditional certification that they are also seeking certification on the issue of whether KBK appropriately calculated overtime pay. (ECF #54 at 15-18.) However, plaintiffs do not identify any instance where they had their overtime miscalculated or otherwise identify that they have standing to pursue this claim. It is apparent that Ricard does not have standing as his ledger cards demonstrate that he did not receive overtime pay while employed by KBK during the limitations period. (Zawadsky Decl., Ex. H.) Mackey's ledger cards demonstrate that he did not receive overtime pay during the two year limitations period. (*Id.* at Ex. I.) In order for Mackey to have standing to assert this claim, he must bear the burden of demonstrating willful conduct and refuting KBK's good faith defense. Even if he can meet this heavy burden, Mackey only received overtime on four occasions, which then raises the question of whether he is "sufficiently interested so that full litigation of the issues involved is assumed." To the extent the putative class may have a tenable claim regarding

overtime, Ricard and Mackey are not the appropriate plaintiffs to represent the putative class and, as such, continued certification of the overtime claim is not warranted.

## III.   Fairness and Procedural Concerns Do Not Support Continued Certification of the Putative Class.

A major consideration for courts when making a determination on collective action certification is whether individualized factual issues are present. *Camilotes*, 286 F.R.D. at 353. The Court must balance the plaintiffs desire to litigate collectively with "the negative effects that certification is very likely to have on the fairness and manageability of the proceedings." *Id.* In *Camilotes*, the Court had concerns that the representative plaintiffs and the opt-in plaintiffs were not similarly situated due to the significant factual differences that existed. *Id.* at 351. The Court noted that this was not a case where representative testimony would be representative of the class as a whole and representative testimony in such a case is unfair to both sides, especially to the defendant who could not cross-examine opt-in plaintiffs as to their individual situation. *Id*. at 354. The individualized proof needed in *Camilotes* justified the decertification of the class. Other courts in this circuit have similarly noted the effect that individualized proof has on the fairness and procedural appropriateness of a collective action. *See Russell v. Illinois Bell Tel. Co*., 721 F. Supp. 2d 804, 822 (N.D. Ill. 2010) ("A collective action is "oxymoronic ... where proof regarding each individual plaintiff is required to show liability.").

As addressed in detail above, individual issues predominate in this case and testimony from every plaintiff will be required to establish both liability and damages. Given that the case cannot be determined on a representative basis, for procedural purposes, this case is not appropriate for certification as a collective action. Although the plaintiffs may desire to litigate collectively, utilizing the collective action mechanism does not promote either fairness or

procedural efficiency as this matter would still have to be conducted as individualized mini-trials for each plaintiff.

Another issue relevant to procedural efficiency stems from Rule 23(a)(1), which requires that the putative class be so numerous that joinder of all class members would be impracticable. Fed. R. Civ. P. 23(a)(1). Although there is no "magic number" or threshold, permissive joinder is generally deemed impracticable when there are more than 40 class members. *Paper Sys. Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 604 (E.D. Wis. 2000) (citation omitted). Here, the putative class, on its best day, cannot surpass 29 members and it is likely that the class will actually have less than 10 members once the time to respond to the notice has passed.[13] Joinder of a small handful of class members is not impracticable in this case and warrants against continued certification. *See Franks,* 2012 WL 3903782, at *8 (declining to certify a putative class of approximately 5 employees and noting that after discovery, proposed class would not even approach forty members). Further and as previously discussed, certification of a small class is not justified where the Court will still be forced to receive individualized testimony and cannot make use of representative testimony and evidence. Because proceeding as a collective action is neither fair nor procedurally efficient, the request for decertification should be granted.

## CONCLUSION

For the reasons set forth above, the Court should decertify the collective action class, dismiss any plaintiffs that have opted-in to the putative class, allow named plaintiffs to continue

---

[13] Average participation rate for collective actions remains between 15 and 30%. Jaime L. Dodge, *Privatizing Mass Settlement*, 90 Notre Dame L. Rev. 336, 344 n.43 (2014). (citing Matthew W. Lampe & E. Michael Rossman, Procedural Approaches for Countering the Dual-Filed FLSA Collective Action and State-Law Wage Class Action, 20 LAB. LAW. 311, 313 (2005) (reporting 15–30% rates); see also Seyfarth Shaw LLP, Fighting to Win: Deconstructing Conditional & Class Certification 10 (2012), available at http://www.seyfarth.com/dir_docs/publications/WHPLITpartII.pdf (reporting 10–20% opt-in rates). Some cases have even generated rates below three percent. *See, e.g., Thiebes v. Wal-Mart Stores, Inc.*, No. CIV. 98-802-KI, 2002 WL 479840, at *3 (D. Or. Jan. 9, 2002) (finding a 2.7% opt-in rate).)

to proceed on the merits of their independent causes of action and award all other and further

relief to which KBK may be entitled.

Dated this 15th day of January, 2016.

/s/ Robert S. Driscoll
John H. Zawadsky
WI State Bar ID No. 1008654
jzawadsky@reinhartlaw.com
Robert S. Driscoll
WI State Bar ID No. 1071461
rdriscoll@reinhartlaw.com
Brittany Lopez Naleid
WI State Bar ID No. 1065486
bnaleid@reinhartlaw.com
Attorneys for Defendant
KBK Services Inc.
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202

Mailing Address:
P.O. Box 2965
Milwaukee, WI 53201-2965
Telephone:  414-298-1000
Facsimile:  414-298-8097